# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MARK JEFFREY AKEY,**

    **Plaintiff,**

    **v.**                                **Case No. 21-CV-1345-SCD**

**KILOLO KIJAKAZI,**
  *Acting Commissioner of the Social Security Administration,*

    **Defendant.**

---

## DECISION AND ORDER

---

In 1991, Mark Akey severely injured his left ankle in a motorcycle accident. He continued working despite his bum ankle for nearly twenty years before he stopped working and applied for disability benefits under the Social Security Act. The Social Security Administration granted his application in part, finding that he became disabled as of June 2012. The limited issue in this case is whether Akey's disability commenced earlier.

Following the latest hearing, an administrative law judge found that Akey's ankle impairment did not significantly limit his ability to do basic work activities prior to the expiration of his disability insured period. Akey seeks judicial review of that decision, arguing that the ALJ erred in evaluating the medical opinions of his orthopedic surgeon and the prior administrative medical findings of a physician hired by the Social Security Administration to review his medical records. He requests that the court award benefits as of his fiftieth birthday and remand the case for further proceedings in all other regards. Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, concedes that the case should be remanded for further consideration of whether Akey had any severe impairments prior to his

date last insured. However, Kijakazi does not believe that the ALJ reversibly erred in evaluating the opinions of Akey's orthopedic surgeon or that an award of benefits is appropriate in this case.

I agree with Akey on each of his arguments. Accordingly, I will reverse the ALJ's decision and remand the matter to the Commissioner with instructions to award Akey benefits starting on his fiftieth birthday. As for the remaining time period, I will reverse and remand for further proceedings.

## BACKGROUND

In 2012, Akey applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively, claiming that he became disabled and unable to work in 2011 due to pain in his upper and lower extremities.

### I. Medical Background

Born in 1962, Akey spent his life working skilled jobs, mostly as a journeyman electrician. R. 39–42, 648–51.[1] He sustained a severe ankle fracture in a motorcycle accident in 1991 but continued to work. R. 43–44, 501, 770. In 2003, Akey injured his neck in a farm accident. R. 44. He reaggravated his neck injury the following year, had surgery, and took a few years off work. Akey returned to work in 2007 as a boilermaker at a power plant, but he was still in considerable pain. R. 42. He made himself a cardboard rest so that he could weld while on his back and found other ways to support his upper body while he worked.

Akey was doing reasonably well in that job until July 2009 when he reaggravated his ankle at work pulling heavy cable. R. 495, 501. He says the company doctor told him that he needed to have a 100% ability to return to work to resume his work duties. R. 60. In August

---

[1] The transcript is filed on the docket at ECF No. 13-2 to 13-15.

Case 2:21-cv-01345-SCD   Filed 03/31/23   Page 2 of 23   Document 30

2009, Akey saw his longtime orthopedic surgeon, Donald J. Zoltan. *See* R. 495–96. He told Dr. Zoltan that he had pain throughout his ankle with every step he took and some pain in his right knee. He took oxycontin, wore an ankle brace, and tried a steroid injection; however, nothing provided much relief for his pain. Akey requested a handicap parking sticker but told Dr. Zoltan that he didn't want any formal work restrictions because he feared he would be fired if he had any restrictions. R. 60–61, 496.

On examination, Akey exhibited an antalgic gait, good range of motion and stability of both knees, significant tenderness in his left ankle, very limited dorsiflexion and plantarflexion (i.e., up and down) of the ankle joint, reasonable hindfoot inversion and eversion (i.e., in and out) to the left hindfoot, and reasonable stability of the ankle. R. 495. Dr. Zoltan observed that the most recent x-ray revealed severe osteoarthritis, a complete loss of joint space, and significant bone spurring of Akey's left ankle. R. 496. He assessed severe posttraumatic osteoarthritis of the left ankle and chronic chondromalacia patella of the right knee, noted that ankle surgery was indicated, and referred Akey to a foot and ankle specialist for consideration of major reconstructive surgery for the left ankle. Dr. Zoltan also signed off for a permanent handicap parking sticker and agreed not to issue any work restrictions. Akey says that Dr. Zoltan told him to "let pain be the guide," which Akey took to mean Dr. Zoltan was giving him "the ability to work within [his] physical limitations." R. 60–61. The same day as the exam, Dr. Zoltan completed a return-to-work form indicating that Akey could return to work with "no restrictions." R. 499.

Akey had been back at work for a few weeks when a twenty-five-pound tripod and winch fell on his hand as it lay flat on a concrete slab. R. 47, 63–65. After a week off work with physical therapy, the power plant laid him off. He received unemployment and continued

looking for work despite his physical symptoms, hoping that he "may be able to pick up work again and get into a company that could take [him] and find a glove that would fit their hand, so to speak." R. 48–51. In the meantime, in December 2009, Akey saw Daniel Guehlstorf, the foot and ankle specialist. *See* R. 501. Dr. Guehlstorf noted that the most recent x-ray showed end-stage posttraumatic arthritis of the left ankle and indicated that Akey would need fusion surgery. However, Akey lost his medical insurance at the end of the year, and he stopped seeing most of his doctors. R. 655–56.[2]

In August 2010, Akey helped a friend with some work at his farm. R. 46–48, 650–51. After helping one day, Akey couldn't get out of bed the next morning due to neck and back pain. Akey took an extra pain pill and, after about five days recovering, he tried performing some lighter work at the farm but was unable to keep up physically. He says that was when he realized he couldn't physically work anymore. R. 52.

## II.     Procedural Background

Akey applied for disability benefits on June 4, 2012, based on a host of musculoskeletal issues. *See* R. 90, 205–17, 249, 261–85. The state agency charged with reviewing the applications on behalf of the Social Security Administration denied the applications upon the agency's initial review of the medical records. *See* R. 92–109. State-agency reviewing physician Pat Chan found that Akey had three severe, but not disabling, impairments: a joint disorder, degenerative disc disease, and obesity. R. 96, 105.[3] According to Dr. Chan, Akey remained capable of performing light exertional work. R. 97–99, 106–08.

---

[2] Akey eventually had ankle surgery in September 2013, after he regained insurance. *See* R. 522–32.

[3] A "severe" impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

On reconsideration, the state agency found Akey disabled as of June 4, 2012 (his application date), concluding that he could perform only sedentary work. *See* R. 110–33. State-agency reviewing physician Janis Byrd noted that the record contained only one medical exam from August 1, 2011 (Akey's alleged onset date) to March 31, 2012 (Akey's date last insured). R. 116, 127. Dr. Byrd observed that, during that exam, Akey told his psychiatrist that his pain was under adequate control and his mood and affect were euthymic. Based on that record, Dr. Byrd found that Akey was not disabled from August 1, 2011, through March 31, 2012, because he did not have a severe medically determinable impairment during that period. She explained that it was not reasonable to extend the sedentary finding any earlier, as Akey did not start seeking treatment for his alleged impairments until July 2012, and up until that point he reported adequate pain control and a stable mood.[4]

Akey appealed the state agency's finding with respect to his disability onset date. R. 148–49. Following a hearing, *see* R. 32–89, an ALJ determined in March 2015 that Akey did not suffer from any severe impairments from August 1, 2010 (his amended alleged onset date) through March 31, 2012 (his date last insured); thus, he was not disabled during that period. R. 15–30. The agency's Appeals Council denied Akey's request for review, R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). Akey sought judicial review, and the district court remanded the matter to the Commissioner because the parties agreed that the ALJ erred in concluding that Akey did not have a severe impairment prior to his date last insured. *See* R. 697–734. The Appeals Council vacated the ALJ's 2015 decision

---

[4] Because the disability onset date was after the date last insured, the state agency denied completely Akey's DIB application.

5

and remanded the matter for rehearing. R. 735–38.

Upon remand, the ALJ held another evidentiary hearing. *See* R. 641–74. Akey's lawyer told the ALJ that he had requested Dr. Zoltan to issue a medical opinion as to Akey's functional limitations back in 2009. R. 647–48. The ALJ agreed to hold the record open for Dr. Zoltan's forthcoming opinion. The ALJ also heard testimony from Akey, R. 648–59, and a vocational expert, R. 659–71.

Dr. Zoltan issued his medical opinion a few days after the hearing. *See* R. 1625–29. Akey's lawyer had asked Dr. Zoltan to provide his best estimate as to Akey's limitations in August 2009. Attached to the form was the treatment note from Akey's visit with Dr. Zoltan that month, as well as Dr. Guehlstorf's note from his visit with Akey in December 2009. The form instructed Dr. Zoltan to base his opinion upon his clinical exam and x-rays and consisted of a series of boxes for Dr. Zoltan to check. Dr. Zoltan marked boxes indicating that, at the time of the August 2009 exam, Akey could stand for thirty minutes at a time, walk for thirty minutes at a time, stand for three hours in an eight-hour workday, and walk for two hours a workday.

On April 10, 2019, the ALJ issued another decision finding that Akey was not disabled from August 1, 2010, through March 31, 2012. *See* R. 629–40. He considered the disability application under 20 C.F.R. § 404.1520(a)(4), which sets forth a five-step process for evaluating DIB claims. At step one, the ALJ determined that Akey did not engage in substantial gainful activity during the period from his amended alleged onset date through his date last insured. R. 634.

The ALJ determined at step two that, through the date last insured, Akey did not have an impairment or a combination of impairments that significantly limited his ability to

perform basic work-related activities for twelve consecutive months. R. 634–35. In reaching that finding, the ALJ first considered the "limited medical evidence" from the period under review. R. 635–37. The ALJ noted that records from 2009 revealed that Akey had posttraumatic osteoarthritis of the left ankle, as confirmed on x-rays. R. 636 (citing Exhibit 9F/10). The ALJ also noted that Akey reported an exacerbation of ankle pain in August 2009, Dr. Zoltan thought Akey might need surgery, and Dr. Zoltan referred Akey to a specialist. R. 636 (citing Exhibit 9F/9–10). However, according to the ALJ, Akey still displayed reasonable stability of the ankle in August 2009. R. 636 (citing Exhibit 9F/9). The ALJ observed that, despite the ankle condition, Dr. Zoltan opined in August 2009 that Akey was able to return to work with "no restrictions." R. 636 (quoting Exhibit 9F/13). The ALJ also observed that Akey continued to work until September 2009, Akey looked for work and thought he was capable of working until 2011, and Akey received unemployment compensation throughout 2010 and part of 2011. R. 636 (citing Exhibits 2E/1; Hearing Testimony; 10D).

The ALJ also considered Akey's subjective allegations. According to the ALJ, Akey's medically determinable impairments could have been reasonably expected to produce his alleged symptoms; however, Akey's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record from the alleged onset date through the date last insured. R. 635. The ALJ specifically noted that Akey's pain was adequately controlled, Akey exhibited good mental function, Akey had no medication side effects, Akey received unemployment compensation, and Akey thought he would be able to work after being laid off in September 2009. R. 637 (citing Exhibits 10D; 1F; Hearing Record).

7

Finally, the ALJ considered the opinion evidence. The ALJ assigned little weight to Dr. Chan's finding that Akey had several severe impairments during the period at issue. R. 638. According to the ALJ, Dr. Byrd's finding that Akey did not have any severe impairments through the date last insured was more consistent with the evidence. The ALJ determined that Dr. Byrd's finding was consistent with Dr. Zoltan's assessment that Akey could return to work in August 2009 with no restrictions and supported by medical evidence from 2011 revealing adequate pain control and no medication side effects. R. 638 (citing Exhibits 9F/13; 1F). Thus, the ALJ assigned great weight to Dr. Byrd's finding of no severe impairments.

The ALJ also considered the opinions of Dr. Zoltan, noting that Zoltan treated Akey for his left ankle and right knee conditions prior to the period at issue. R. 638 (citing Exhibit 9F). The ALJ assigned some weight to Dr. Zoltan's opinion in August 2009 that Akey could return to work with no restrictions. R. 638 (citing Exhibit 9F/13). He observed that Dr. Zoltan offered that opinion at the time when he had recently examined Akey's left ankle. R. 638 (citing Exhibit 9F). According to the ALJ, the return-to-work authorization indicated that Akey's left ankle impairment did not cause more than minimal limitations on his ability to perform basic work activities. The ALJ also acknowledged that Akey had thought restrictions could result in his termination at work. R. 638 (citing Exhibit 9F/10).

In contrast, the ALJ assigned little weight to Dr. Zoltan's February 2019 opinion that Akey had significant limitations standing and walking in August 2009. R. 638 (citing Exhibit 23F). The ALJ noted the opinion was "afforded many many years after the date last insured" and remarked that it was "generally speculative back in time." *Id.* The ALJ further noted that "Dr. Zoltan filled out a checklist-style form with no explanation for the limitations therein."

8

*Id.* Because the ALJ determined that Akey did not have any severe impairments from his amended alleged onset date through his date last insured, he did not proceed through the other steps of the sequential evaluation process.

The ALJ's 2019 decision became the final decision of the Commissioner after remand because the Appeals Council overruled Akey's written exceptions and declined to assume jurisdiction over the case, R. 622–24. *See* 20 C.F.R. §§ 404.955, 404.984. Akey filed this action in November 2021, seeking judicial review of the Commissioner's latest decision denying his claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was randomly assigned to me, and all parties subsequently consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "When reviewing

9

the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Akey contends the ALJ erred in evaluating the medical opinions of Dr. Zoltan and the prior administrative medical findings of Dr. Byrd. As relief for those errors, he asks the court to modify the ALJ's decision to find him disabled since March 17, 2012 (his fiftieth birthday) and to reverse and remand in all other regards, limiting the scope of remand to the period from August 1, 2010 (his amended alleged onset date) through March 16, 2012 (the day before his fiftieth birthday). Alternatively, Akey asks the court to reverse and remand for further proceedings, limiting the scope of remand to the period from August 1, 2010 (his amended alleged onset date) through June 3, 2012 (the day before he was found to be disabled). *See* ECF Nos. 21, 29.

Kijakazi concedes that this case should be remanded for further consideration of the ALJ's step-two finding, including reevaluating the prior administrative medical findings of Dr. Byrd. However, Kijakazi does not believe that the ALJ reversibly erred in evaluating the opinions of Dr. Zoltan. Kijakazi also maintains that the court should not remand for an award of benefits. *See* ECF No. 28.

## I.      The ALJ Erred in Evaluating Dr. Zoltan's Medical Opinions

Because Akey applied for disability benefits before March 27, 2017, the old social security regulations regarding the evaluation of opinion evidence apply to his claim. *See* 20 C.F.R. § 404.1527. According to those regulations, "[a]n ALJ must consider all medical opinions in the record." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(b), (c); *Knight v. Chater*, 55 F.3d 309, 313–14 (7th Cir. 1995)). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

The regulations also explain how an ALJ must weigh medical opinions. *See* § 404.1527(c). "A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record." *Roddy*, 705 F.3d at 636 (citing 20 C.F.R. § 404.1527(c)(2); *Skarbek*, 390 F.3d at 503). "When controlling weight is not given, an ALJ must offer 'good reasons' for doing so, after having considered" several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; whether the physician is a specialist; and any other factors that tend to support or contradict the medical opinion. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (citing *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)); *see also* § 1527(c). Courts review an ALJ's weighing of a treating-source opinion for substantial evidence. *See Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021).

### A. Substantial evidence does not support the weight the ALJ gave to Dr. Zoltan's 2009 return-to-work authorization

Akey argues that the ALJ erred in granting weight to Dr. Zoltan's August 2009 opinion that Akey could return to work with "no restrictions." I agree, for two reasons.

First, the ALJ failed to fully consider the context within which Dr. Zoltan offered his opinion. Dr. Zoltan signed the return-to-work form the same day he examined Akey. At that appointment, Akey complained about increased pain in his left ankle with every step he took. The physical exam revealed an antalgic gait, significant tenderness in the left ankle, and very limited ability to flex the ankle up and down. Dr. Zoltan also reviewed recent x-rays showing severe osteoarthritis, complete loss of joint space, and significant bone spurring in the left ankle. Dr. Zoltan assessed severe posttraumatic osteoarthritis of the left ankle, noted that surgery was likely, referred Akey to a foot and ankle specialist for consideration of major reconstructive surgery of the left ankle, and signed off on a handicap parking sticker. Dr. Zoltan explained that Akey would "continue to work without formal restrictions because he feels he will be fired if he is put on any restrictions." R. 496. Given that context, it's clear that Dr. Zoltan authorized Akey to return to work with no restrictions as a favor to his longtime patient—Zoltan began treating Akey in 1989, R. 61—not because that's what the medical evidence dictated.

Kijakazi points out that the ALJ did mention Akey's concern that he would be fired if he had work restrictions. It's true the ALJ "acknowledge[d] that [Akey] thought restrictions could result in his termination at work." R. 636 (citing Exhibit 9F/10). But in acknowledging *Akey's* fears about termination, the ALJ failed to recognize that those fears formed the sole basis for *Dr. Zoltan's* return-to-work authorization. The ALJ implied that Dr. Zoltan's opinion was supported by the medical evidence when, in fact, Dr. Zoltan's own contemporaneous

treatment notes showed the exact opposite—the same day Dr. Zoltan signed off on Akey's ability to return to work without restrictions he assessed significant functional issues with Akey's left ankle and referred Akey to a specialist for major reconstructive surgery.

Kijakazi also insists that the ALJ discussed the evidence concerning Dr. Zoltan's August 2009 examination earlier in his decision. The ALJ did note in his summary of the medical evidence that x-rays revealed posttraumatic osteoarthritis of the left ankle, Akey reported an exacerbation of pain in August 2009, Dr. Zoltan believed that ankle surgery may be required, Dr. Zoltan referred Akey to a specialist, and Akey displayed reasonable stability of the ankle upon examination. *See* R. 636 (citing Exhibit 9F/9–10). But the ALJ failed to note that at that same appointment Akey also walked with a limp, exhibited significant tenderness in the left ankle, and had very limited ability to flex his ankle up and down. Perhaps more importantly, the ALJ did not connect any of this evidence to his weighing of Dr. Zoltan's 2009 opinion or explain how this evidence was consistent with an ability to work without any restrictions.

Second, the ALJ did not cite any substantial evidence supporting Dr. Zoltan's return-to-work authorization. Kijakazi says the ALJ discussed evidence that was consistent with and supported by Dr. Zoltan's opinion earlier in his decision. However, most of the evidence Kijakazi cites relates to Akey's knee issues, not the severe posttraumatic osteoarthritis of his left ankle. *See* ECF No. 28 at 3. The only evidence Kijakazi cites directly relating to Akey's left ankle is the fact that he displayed reasonable stability of the ankle during his August 2009 exam with Dr. Zoltan. But Dr. Zoltan didn't appear to place any significance on that finding, and the ALJ ignored all the other abnormal findings from that exam.

13

Kijakazi also points out that the ALJ noted that Akey did not have any medication side effects, reported that his pain was adequately controlled, continued looking for work, thought he was capable of working, and received unemployment compensation during the period under review. It's unclear how the notation about adequate pain control is consistent with or supports Dr. Zoltan's 2009 opinion, as Akey made that statement during a fifteen-minute medication check with his psychiatrist in September 2011—that is, during a period in which Akey had been out of work for about two years and yet was still taking 120 milligrams of oxycontin every day. *See* R. 376. Moreover, because the ALJ did not discuss any of this evidence while evaluating Dr. Zoltan's opinions, it's unclear whether the ALJ relied on any of it when he decided to grant weight to the 2009 return-to-work authorization.

Kijakazi suggests that the alleged errors concerning the consistency and supportability of Dr. Zoltan's opinion are harmless because the ALJ did not give controlling weight to the return-to-work authorization. Although the ALJ purported to give only "some weight" to that opinion, it's clear from reading the decision as a whole that the ALJ placed significant emphasis on the return-to-work authorization. The ALJ did not point out any issues with the opinion, he relied on the opinion to explain why he was crediting one state-agency reviewing physician's findings over the other, and his ultimate conclusion—that Akey did not have any severe impairments during the relevant period—is entirely consistent with the belief that Akey had no work restrictions. *See* R. 636–40. The return-to-work authorization therefore featured prominently in the ALJ's finding that Akey was not disabled.

In sum, substantial evidence does not support the weight the ALJ gave to Dr. Zoltan's August 2009 opinion that Akey could return to work with no restrictions.

14

**B.    The ALJ failed to offer good reasons for assigning little weight to Dr. Zoltan's February 2019 opinion**

Akey also argues that the ALJ erred in evaluating Dr. Zoltan's February 2019 opinion that Akey had significant limitations standing and walking back in August 2009. The ALJ assigned little weight to Dr. Zoltan's 2019 opinion because "it was afforded many many years after the date last insured," it was "generally speculative back in time," and it was "a checklist-style form with no explanation for the limitations therein." R. 638. Akey contends that none of the rationales provide a good reason for rejecting the opinion. I agree.

First, the fact that Dr. Zoltan authored his opinion years after Akey's date last insured alone is not a good reason for rejecting it. In *Marquardt v. Saul*, the Seventh Circuit reversed an ALJ's decision that gave little weight to an opinion from a treating counselor in part because "it was rendered three years after the date last insured." *Marquardt v. Saul*, 798 F. App'x 34, 36–37 (7th Cir. 2020). The court noted that ALJs cannot ignore "retrospective medical opinions (created after the date last insured) that are consistent with past symptoms." *Id.* at 37 (citing *Bjornson v. Astrue*, 671 F.3d 640, 642 (7th Cir. 2012); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998)). Thus, the fact that the counselor's opinion was rendered three years after the date last insured was "not a valid basis for discounting a medical opinion that is consistent with evidence of disability during the insured period." *Marquardt*, 798 F. App'x at 37 (citing *Estok*, 152 F.3d at 640).

Here, Dr. Zoltan's 2019 opinion appears consistent with evidence of disability during the insured period. X-rays from 2009 revealed severe osteoarthritis, complete loss of joint space, and significant bone spurring of Akey's left ankle. *See* R. 496. During his exam with Dr. Zoltan in August 2009, Akey walked with a limp, exhibited significant tenderness in his left ankle, and had very limited ability to flex his ankle up and down. R. 495. And Dr.

15

Guehlstorf—the foot and ankle specialist—remarked in December 2009 after examining Akey and reviewing his x-rays that ankle fusion surgery was inevitable. R. 501. The ALJ did not discuss much of this evidence in his decision. To the extent he did, the ALJ failed to consider whether the evidence was consistent with Dr. Zoltan's retrospective opinion.

To be sure, the ALJ did mention some evidence from the relevant period that he thought showed Akey did not suffer from any severe impairments during that time. For example, earlier in the decision the ALJ noted that Akey continued to work until September 2009, looked for work after being laid off, thought he was still capable of working in 2011, received unemployment in 2010 and part of 2011, and reported adequate pain control to his psychiatrist in 2011. *See* R. 636. But the ALJ did not discuss any of this evidence when evaluating Dr. Zoltan's opinion. And the evidence is not necessarily inconsistent with Dr. Zoltan's opinion that in August 2009 Akey could stand for thirty minutes at a time, walk for thirty minutes at a time, stand for three hours in an eight-hour workday, and walk for two hours a workday.

Second, it's unclear what the ALJ meant when he said that Dr. Zoltan's 2019 opinion was "generally speculative back in time." Kijakazi speculates this was simply another way for the ALJ to call attention to the gap between the relevant time period and Dr. Zoltan's opinion. If true, then this reason is invalid for the same reason the "many many years" comment was invalid. Akey suggests that criticizing an opinion for being speculative back in time seems to reference an opinion that uses current medical records to make extrapolations about the past. But that's not what Dr. Zoltan did here; rather, Zoltan reviewed contemporaneous treatment records—from his own exam in August 2009 and Dr. Guehlstorf's exam in December 2009— to render an opinion as to Akey's functional limitations at the time of those exams. Whatever

16

the ALJ meant by the "speculative" phrase, he did not build an accurate and logical bridge between the evidence and his decision to reject Dr. Zoltan's 2019 opinion.

Third, the use of a checklist-style form alone is not a good reason for rejecting a medical opinion. In *Larson v. Astrue*, the Seventh Circuit held that "a check-box form . . . takes on greater significance when it is supported by medical records." *Larson*, 615 F.3d at 751 (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). The ALJ here found that Dr. Zoltan did not provide *any* explanation for the limitations expressed in his 2019 opinion. However, the form explicitly indicated the opinions therein were based on Dr. Zoltan's own clinical exam and x-rays:

<u>Based upon my clinical exam and x-rays:</u>

1.  At the time of my exam, Mr. Akey was able to do the following without a break?

    a.  **Stand** ☐ 15 min ☒ 30 min ☐ 45 min ☐ 1 hour ☐ 2 hours ☐ 3 hours ☐ 4 hours ☐ 5 hours ☐ 6 hours ☐ 7 hours ☐ 8 hours

    b.  **Walk** ☐ 15 min ☒ 30 min ☐ 45 min ☐ 1 hour ☐ 2 hours ☐ 3 hours ☐ 4 hours ☐ 5 hours ☐ 6 hours ☐ 7 hours ☐ 8 hours

2.  At the time of my exam, Mr. Akey was able to do the following in an 8 hour workday?

    a.  **Stand** ☐ 15 min ☐ 30 min ☐ 45 min ☐ 1 hour ☐ 2 hours ☒ 3 hours ☐ 4 hours ☐ 5 hours ☐ 6 hours ☐ 7 hours ☐ 8 hours

    b.  **Walk** ☐ 15 min ☐ 30 min ☐ 45 min ☐ 1 hour ☒ 2 hours ☐ 3 hours ☐ 4 hours ☐ 5 hours ☐ 6 hours ☐ 7 hours ☐ 8 hours

    Donald J. Zoltan, M.D.              (DATE)      2/26/19          R.

1626.

17

Kijakazi says the ALJ was free to ignore Dr. Zoltan's supporting explanation because those were the words of Akey's lawyer, not Dr. Zoltan. But there is no reason to believe Dr. Zoltan missed that proposed explanation or disagreed with it. After all, the form emphasized the importance of the phrase with underlining; Dr. Zoltan did not cross out the proposed explanation, express any disagreement with the explanation, or replace the proposed explanation with his own. *See* R. 1626. Besides, the ALJ said the form contained no explanation, not that he doubted whether the explanation on the form was truly Dr. Zoltan's.

Moreover, the rest of the form clears up any doubt as to whether Dr. Zoltan's checkmarks were sufficiently supported. In his cover letter, Akey's lawyer asked Dr. Zoltan to provide his best estimate of Akey's limitations in August 2009 based on "a review of [Dr. Zoltan's] treatment notes." R. 1625. Akey's lawyer also attached a copy of Dr. Zoltan's August 2009 treatment note to the form (which detailed his clinical exam and contemporaneous x-ray interpretation), as well as the December 2009 treatment note from Dr. Guehlstorf. *See* R. 1627–29. The ALJ, however, ignored this other supporting evidence.

In sum, the ALJ failed to offer good reasons for assigning little weight to Dr. Zoltan's February 2019 opinion that Akey had significant limitations standing and walking in August 2009.

## II. Substantial Evidence Does Not Support the ALJ's Reliance on Dr. Byrd's Prior Administrative Medical Findings

The parties here agree that this case should be remanded for further consideration of the ALJ's step-two finding, including reevaluating Dr. Byrd's prior administrative medical finding that Akey did not have any severe impairments from August 1, 2010 (his amended alleged onset date) through March 31, 2012 (his date last insured). Akey nevertheless asks the

court to explain the problems with Dr. Byrd's finding, as this issue was also the basis for the previous remand.

According to social security regulations, state-agency medical consultants "are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1). ALJs evaluate prior administrative medical findings of state-agency medical consultants like they evaluate medical opinions. That is, an ALJ "must examine the § 404.1527(c) factors and minimally articulate its reasoning for crediting non-treating state agency medical opinions." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022). Like all medical opinions, courts "review the ALJ's weighing of [prior administrative medical findings] for substantial evidence." *Id.*

Substantial evidence does not support the ALJ's reliance on Dr. Byrd's prior administrative medical findings. The ALJ offered two reasons for why he assigned great weight to Dr. Byrd's finding that Akey did not have any severe impairments during the relevant period: (1) the finding was consistent with Dr. Zoltan's 2009 return-to-work authorization; and (2) the finding was supported by the available medical evidence from 2011 revealing adequate pain control and no medication side effects. R. 638 (citing Exhibits 9F/13; 1F). I've already explained why the ALJ placed too much emphasis on the return-to-work authorization. Thus, the ALJ's first reason clearly is inadequate.

The ALJ's second reason—alleged supportability with the record—doesn't hold up either. The ALJ failed to recognize that Dr. Byrd reviewed only one medical record from the period under review—a fifteen-minute medication check with a psychiatrist in September 2011. Dr. Byrd either ignored or did not have access to the 2009 x-rays of Akey's ankle, the August 2009 appointment with Dr. Zoltan, and the December 2009 appointment with Dr. Guehlstorf. The ALJ's failure to address this evidentiary deficiency is especially troubling

19

given that Dr. Byrd never examined Akey. As Akey puts it, the persuasiveness of a state-agency reviewing consultant's findings lives or dies by the consultant's access to medical records. And yet Dr. Byrd did not consider any of the relevant evidence that demonstrated Akey had a severe ankle impairment prior to his date last insured.[5]

In sum, substantial evidence does not support the ALJ's assigning great weight to Dr. Byrd's prior administrative medical finding that Akey did not suffer from any severe impairments during the period under review.

## III.    Akey is Entitled to Disability Benefits Starting on His Fiftieth Birthday

That leaves the issue of the appropriate remedy for the ALJ's errors. Dr. Zoltan opined in February 2019 that Akey could not perform the standing or walking requirements of light exertional work in August 2009.[6] Akey argues that Dr. Zoltan's 2019 opinion is entitled to controlling weight because it is well-supported and not inconsistent with other substantial evidence in the record. If that opinion were adopted, then Akey would be disabled as of March 17, 2012 (his fiftieth birthday), per the Social Security Administration's Medical-Vocational Guidelines (i.e., the "Grids"). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14. Kijakazi argues that an award of benefits is not appropriate in this case because other evidence in the record contradicts Dr. Zoltan's 2019 opinion. Thus, according to Kijakazi, the case should be remanded for further proceedings.

---

[5] Dr. Gueshlstorf assessed Akey with end-stage posttraumatic arthritis of his left ankle and ankle joint in December 2009. There's no evidence this impairment improved at any point from that date until June 2012, the time by which the Social Security Administration found Akey disabled.

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

The ALJ's failure to give controlling weight to Dr. Zoltan's 2019 opinion was an error requiring remand. "When a reviewing court remands to the Appeals Council, the ordinary remedy is a new hearing before an administrative law judge. In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits." *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018) (collecting cases).

This is one of those unusual cases. The Social Security Administration has already determined that Akey became disabled in June 2012 because at that point he was not capable of more than sedentary work. The ALJ here determined that Akey was not disabled any earlier, finding that Akey did not have a severe impairment prior to March 31, 2012 (his date last insured). The Social Security Administration concedes the ALJ erred in reaching that finding; indeed, significant evidence contradicts the ALJ's step-two finding. The issue therefore is whether there is evidence in the record showing that Akey was capable of more than sedentary work prior to his date last insured.

Kijakazi has failed to point to any such evidence. She says that the findings of the state-agency reviewing physicians, Dr. Chan and Dr. Byrd, cut against Dr. Zoltan's 2019 opinion. However, as discussed above, those physicians did not examine Akey, and they did not address the most relevant evidence relating to Akey's ankle impairment. Substantial evidence does not support their findings. Kijakazi also contends that Dr. Zoltan's 2019 opinion conflicts with his 2009 return-to-work authorization. But again, the contemporaneous evidence shows that Dr. Zoltan authorized Akey to return to work in August 2009 as a favor to his longtime patient, not because Akey's ankle caused no limitations.

Kijakazi points to three other pieces of "contradictory" evidence: Dr. Zoltan's August 2009 examination, Akey's receipt of unemployment compensation in 2010 and 2011, and Akey's 2011 report to his psychiatrist that his medications adequately controlled his pain and did not cause any side effects. The 2009 examination does not contradict Dr. Zoltan's 2019 opinion; in fact, Dr. Zoltan relied primarily on that examination to inform his opinion, and the results of the exam support it. The other evidence Kijakazi cites may be inconsistent with Akey's subjective reports of disabling symptoms. However, Akey's receipt of unemployment and adequate pain control with oxycontin during a period he was not working do not show he was capable of light work during the relevant period.

In sum, all factual issues have been resolved, and the resulting record supports the conclusion that Akey qualifies for disability benefits as of his fiftieth birthday. Once Dr. Zoltan's 2019 opinion is given its proper weight, the record compels the conclusion that Akey was not capable of more than sedentary work as of that date. "There is no sound basis in the record to dispute that opinion." *Kaminski*, 894 F.3d at 876.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in evaluating the medical opinions of Akey's orthopedic surgeon (Dr. Zoltan) and the prior administrative medical findings of the state-agency reviewing physician (Dr. Byrd). Dr. Zoltan's treating-source opinion is well-supported by the objective medical findings and is not inconsistent with other substantial evidence in the record. The record does not contain any well-supported evidence contrary to Dr. Zoltan's opinion, and adopting that opinion would result in Akey being disabled as of his fiftieth birthday per the Grids.

22

Accordingly, the court **REVERSES** the Commissioner's decision and **REMANDS** the matter under sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), with instructions that Akey be awarded benefits starting on March 17, 2012. *See Kaminski*, 894 F.3d at 875–76 (7th Cir. 2018); *Phillips v. Colvin,* 171 F. Supp. 3d 819, 830 (E.D. Wis. 2016). In all other regards, the court **REVERSES** the Commissioner's decision and **REMANDS** this action to the Commissioner pursuant to sentence four for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 31st day of March, 2023.

STEPHEN C. DRIES
United States Magistrate Judge